WOODALL INDUSTRIES, INC., a Delaware corporation, Plaintiff-Appellee,

v.

MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, a Massachusetts corporation, Defendant-Appellant.

No. 72–1533.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 6, 1972.

Decided April 6, 1973.

Rehearing Denied Aug. 14, 1973.

Certiorari Denied Jan. 7, 1974. See 94 S.Ct. 871.

John E. S. Scott, Detroit, Mich., for defendant-appellant; Dickinson, Wright, McKean & Cudlip, Detroit, Mich., on brief.

Harold B. Desenberg, Detroit, Mich., for plaintiff-appellee; Moll, Desenberg, Purdy, Glover & Bayer, Detroit, Mich., on brief.

Before KENT, Circuit Judge, and McALLISTER and O'SULLIVAN, Senior Circuit Judges.

KENT, Circuit Judge.

This is an appeal from a judgment for the plaintiff-appellee in a suit upon a "key man" life insurance policy in the face amount of $75,000. The parties will be described as in the court below.

Plaintiff instituted a suit upon the policy and the defendant filed a counterclaim for recission of the policy. The jury returned a verdict in favor of the plaintiff. During the course of the trial

and after judgment, the defendant made appropriate motions for a directed verdict, for judgment notwithstanding the verdict and for a new trial, all of which were denied.

On this appeal defendant claims that the trial court should have entered a judgment for the defendant because of alleged material misrepresentations on the application for the insurance policy in question. The defendant also challenges the instructions given by the trial court, but because of the disposition we make of the first issue presented we do not reach this issue.

The policy in question was a "key man" life insurance policy on the life of John H. Vye, an employee of the plaintiff. The record discloses that Vye consulted a Dr. Paul M. Becker in November, 1966. During the course of his examination Dr. Becker detected a diastolic heart murmur. Dr. Becker informed Vye that "he had a significant heart murmur which I considered secondary to a defective aortic valve." Vye was informed that he had no overt symptoms as a result of this condition but that he should inform his family physician of the condition which Dr. Becker had diagnosed. Vye was further informed that x-rays would be required. The x-rays were taken and were compatible with Becker's diagnosis. This fact was communicated to Mr. Vye.

One year later, and on November 20, 1967, Vye signed an application for the insurance policy in suit. During the course of the physical examination certain questions were presented to Vye by Dr. J. Kenner Bell, who examined him for the defendant insurance company, and the answers given by Vye were recorded. Question 3 included:

"3.A. Have you had a physical or health examination within three years? Yes.

Give names of physicians and date of latest examination. 1967. Dr. M. D. MacQueen, M.D. 1654 1st Nat. Bldg., Detroit, Mich.

B. Did symptoms or complaints prompt examination? No.

C. Were you given treatment, prescription or advice? No."

Question 4 included the following:

"4. During the past ten years have you had

A. Advice from or attendance or treatment by physicians, other practitioners or psychologist? Yes.

\* \* \* \* \* \*

D. X-ray, electrocardiographic or blood examinations? Yes."

Question 6 included:

"6. At any time have you had any known indication of or *been told* that you had

A. Any disorder of the heart or blood vessels? No." (Emphasis added.)

In explanation of the answers given the following statement was made:

"3.A.–4.A. & D. Had an executive type of exam a short time ago by Dr. MacQueen. This included E.K.G., Chest X-Ray, B1. Chemistry & Sigmoidoscopy. All reports normal. No treatment."

It thus appears that the insurance company was never informed of Dr. Becker's examination, of Dr. Becker's findings, of the x-ray report to Dr. Becker, or of the information which he had given to the applicant for insurance, John Vye, relative to the "significant heart murmur which [Dr. Becker told Vye] was secondary to a defective aortic valve."

Vye died on December 2, 1968, of a heart condition, and interestingly enough, after Vye had the original heart attack in a drug store, Dr. Becker was called to attend him and continued to attend him until his death a few days later.

It is conceded by all counsel that Michigan law is controlling in this diversity of citizenship case. The applicable Michigan statute, which was last

amended in 1957, provides as follows: M.C.L.A. 500.2218, M.S.A. 24.12218:

[§ 24.12218 Disability insurance; false statements in application; material misrepresentation, definition, effect.] Sec. 2218. The falsity of any statement in the application for any disability insurance policy covered by chapter 34 of this code may not bar the right to recovery thereunder unless such false statement materially affected either the acceptance of the risk or the hazard assumed by the insurer.

(1) No misrepresentation shall avoid any contract of insurance or defeat recovery thereunder unless the misrepresentation was material. No misrepresentation shall be deemed material unless knowledge by the insurer of the facts misrepresented would have led to a refusal by the insurer to make the contract.

(2) A representation is a statement as to past or present fact, made to the insurer by or by the authority of the applicant for insurance or the prospective insured, at or before the making of the insurance contract as an inducement to the making thereof. A misrepresentation is a false representation, and the facts misrepresented are those facts which make the representation false.

(3) In determining the question of materiality evidence of the practice of the insurer which made the contract with respect to the acceptance or rejection of similar risks shall be admissible.

(4) A misrepresentation that an applicant for life, accident or health insurance has not had previous medical treatment, consultation or observation, or has not had previous treatment or care in a hospital or other like institution, shall be deemed, for the purpose of determining its materiality, a misrepresentation that the applicant has not had the disease, ailment or other medical impairment for which such treatment or care was given or which was discovered by any licensed medical practitioner as a result of such consultation or observation. If in any action to rescind any contract or to recover thereon, any misrepresentation is proved by the insurer, and the insured or any other person having or claiming a right under the contract, shall prevent full disclosure and proof of the nature of the medical impairment, the misrepresentation shall be presumed to have been material."

Michigan Law further provides, M.C.L.A. 500.4016; M.S.A. 24.14016:

"Sec. 4016. There shall be a provision that all statements made by the insured, shall, in the absence of fraud, be deemed representations and not warranties, and that no such statement shall avoid the policy unless it is contained in a written application and a copy of such application shall be endorsed upon or attached to the policy when issued."

There was much confusion in the Michigan Courts and in reality two lines of authority as to the effect of an innocent misrepresentation in a suit for recission of an insurance policy. This was resolved in an opinion by Judge McAllister in Franklin Life Insurance Co. v. William J. Champion & Co., 350 F.2d 115 (6th Cir. 1965), cert. denied 384 U.S. 928, 86 S.Ct. 1445, 16 L.Ed.2d 531 (1966). As stated by the Michigan Court of Appeals in Lipsky v. Washington National Insurance Co., 7 Mich.App. 632, 152 N.W.2d 702 (1967):

"Had it not been for the extensive and recent attention focused on this matter by Judge McAllister, senior circuit judge of the Federal 6th Circuit Court of Appeals, in Franklin Life Insurance Company v. William J. Champion & Company (CCA 6, 1965), 350 F.2d 115, cert. denied (1966), 384 U.S. 928, 86 S.Ct. 1445, 16 L.Ed.2d 531, this Court would have had little outside help in reconciling two diverse and strong lines of Michigan precedent." 152 N.W.2d at 705.

Plaintiff relies upon the *Franklin Life Insurance Company* decision, but it appears to this Court that its reliance is misplaced. In that case the policyholder was asked in an application for reinstatement whether he was in good health, the answer was in the affirmative although in fact he was at the time afflicted with cancer from which he ultimately died. The existence of the cancer was unknown to the applicant. The Court in *Franklin Life*, in a very carefully considered and exhaustive opinion, held that under Michigan law the statement as to his good health made by the insured was an innocent representation and an honest answer to the question propounded. The Court said at page 126 of 350 F.2d:

"If such statements, or representations, as to good health are made in good faith, they are to be understood by the insurer to be only bona fide representations that the applicant is in good health according to the best of his belief and without any reasonable cause on his part to believe that he is not in good health. In such a case, this kind of statement, or representation, is to be deemed not material to the assumption of the risk."

The Michigan Court of Appeals has accepted without qualification Judge McAllister's interpretation of the law on the issue stated. Lipsky v. Washington National Insurance Co., 7 Mich.App. 632, 152 N.W.2d 702 (1967); Mutual Benefit Life Insurance Co. v. Abbott, 9 Mich. App. 547, 157 N.W.2d 806 (1968). But it appears without any question that in each of the cases cited the answer given by the insured was an honest answer to a question asking an opinion. Such is not the case here. Rather this case more clearly resembles Dedic v. Prudential Insurance Co., 14 Mich.App. 274, 165 N.W.2d 295 (1968). In *Dedic* the insured failed to disclose a number of consultations with physicians. The only issue before the court was whether this failure to disclose was material to the risk. The trial court granted a directed

verdict in favor of the insurance company which was affirmed on appeal.

Judge McAllister in his dissent makes the following statement:

"Whether Mr. Vye, as a layman, was equipped to determine what facts were material to the acceptance of the risk was, in our opinion, a question for the jury."

This is not a jury question, it is not for an applicant to determine that which is and that which is not material to an insurance company's acceptance of a risk. The uncontradicted testimony of C. Paul Nay, Chief Medical Director of the defendant insurance company, was that the policy would not have issued if the company had been informed of Dr. Becker's examination, findings, and advice to Mr. Vye. With that testimony the mistatements in the application were clearly material misrepresentations under the statute cited. No question on the application for insurance suggested to the insured that it was for him to determine what was material to the risk. At the time of the application Mr. Vye had one obligation and only one obligation, to make truthful answers, as the truth was known to him, to the questions asked of him. Obviously, he did not do this and, on this record, no court or jury would be justified in reaching the conclusion that the untruthful answers were made inadvertently or through lack of knowledge.

To summarize: There can be no question but what the insured knew that he had been examined by Dr. Paul Becker and from conversations at the time of his last illness, testified to by Dr. Becker, and undisputed, it is eminently clear that the insured continued to be aware of the heart difficulty which Dr. Becker had discovered and disclosed to the insured. It is undisputed on this record that had the defendant insurance company had knowledge of the facts misrepresented (by the untruthful answers to questions 3 and 4, particularly question 6) it would have refused to make the contract of insurance upon which the verdict depends. For the reasons herein

stated we conclude that the answers given by the insured were misrepresentations which were material within the meaning of the Statute cited. M.C.L.A. 500.2218, M.S.A. 24.12218. Under these facts the motion for directed verdict made on behalf of the defendant should have been granted. Dick v. John Hancock Mutual Life Insurance Co., 434 F. 2d 808 (6th Cir. 1970).

The judgment of the District Court is reversed and the case is remanded for entry of judgment for the defendant.

McALLISTER, Senior Circuit Judge (dissenting).

On November 28, 1967, defendant-appellant, Massachusetts Mutual Life Insurance Company, insured the life of John H. Vye for $75,000.00, payable to his employer, Woodall Industries, Inc. Mr. Vye had absolutely no interest, nor did any member of his family, in the policy or proceeds of the policy of the life insurance.

On or about December 2, 1968, while the policy was in full force and effect, Mr. Vye died. He was always a vigorous man until the day before his death. On that day he was in a neighborhood pharmacy when he suddenly complained of pains in his chest, which were so severe as to cause him to sit down. The pharmacist gave him smelling salts which seemed to relieve him, and called Dr. Paul M. Becker, a neighborhood physician, who, by telephone, directed that Mr. Vye be taken immediately by ambulance to the William Beaumont Hospital, where he was at once placed in the Intensive Care Unit. The next day he seemed to be on the road to recovery and was removed to a private room where he suddenly died.

The defendant-appellant insurance company failed and refused to make the payment for such life insurance to the Woodall Industries, Inc., and the latter brought suit on the policy. The case was tried before a jury which returned a verdict giving the full amount of the policy to appellee, Woodall Industries, Inc.; and the insurance company appealed.

Although Mr. Vye was Executive Vice President of a corporation, he used all of his spare time engaging in physical work around his home—cutting trees, planting bushes, splitting logs, mowing his lawn, raking the leaves, removing the leaves from the roof and gutters, as well as removing snow from the roof, shoveling snow from the walks and driveway (his neighbors had employed men with tractors to do this work), trimming trees by getting up into them by ladders, as well as removing screens and storm-windows each season—all of which is unusual physical effort, such that in our day most men of his age, in similar employment, hire others to do.

Mr. Vye came from Wisconsin. He was married in 1941 to Mrs. Vye and lived with her until his death on December 2, 1968. During that period Mr. Vye suffered from no physical ailments, nor were his activities around the house restricted in any way. At that time, the Vyes were living in Milwaukee and afterward moved to Van Wert, Ohio, where they lived for two years. From Van Wert, they moved to Hudson, Wisconsin, "near the Twin Cities," and remained there for six years. They then moved to Birmingham, Michigan. He rarely saw a doctor and had no family physician. The only time he saw a doctor was for flu or some minor, common ailment. The only general physical examinations he had before that in the instant case were when he was examined in 1946 for and obtained $5,000 of life insurance, and when he was examined by an insurance company physician in 1964 and, as a result, secured $45,000 of life insurance.

The insurance company, in its appeal, relies on false representations made by Mr. Vye in the application for the policy, in that he stated he had no known indication, or had been told, that he had any disorders of the heart or blood vessels; that, on the contrary, Mr. Vye had a long history of, and was suffering

from, disorders of the heart and blood vessels for many years preceding the date of application for the insurance, all of which were known to Mr. Vye but not disclosed in the application.

The issue in the case is whether Mr. Vye, at the time of the application, was suffering from disorders of the heart and blood vessels and knew that he was suffering from such disorders, and that he had fraudulently concealed pertinent information from appellant insurance company.

In the application for insurance, Mr. Vye was asked, and replied:

"During the last ten years have you had

"Advice from or attendance or treatment by physicians, other practitioners, or psychologists? Yes. * * *

"X-ray, electrocardiographic or blood examinations? Yes. * * *

"During the past ten years have you any known indication of

"Pain, pressure, or discomfort in the chest? No.

"Shortness of breath, palpitation or irregular heart action? No."

It is not claimed that any of the foregoing answers constituted misrepresentations. Mr. Vye was further asked:

"At any time have you had any known indication or been told that you had

"Any disorder of the heart or blood vessels? No."

It is this answer upon which the insurance company relies in its contention that the policy should be cancelled because of material misrepresentations made by Mr. Vye. We disagree with this contention.

Mr. Vye was also asked whether he had any gallstones or gall-bladder disorder, ulcer of the stomach or bowel, or any disorder of the stomach, liver, intestines or rectum, and his reply was "No."

The real basis of defendant-appellant's contention is as follows:

On November 2, 1966, Mr. Vye called on Dr. Paul M. Becker, a physician having an office in the neighborhood of Mr. Vye's home in Birmingham, Michigan. Mr. Vye had never consulted Dr. Becker before, and never consulted him afterward.

Dr. Becker is the chief witness of the insurance company in this case.

Why Mr. Vye came to see Dr. Becker was because he had occasional rectal bleeding. Dr. Becker examined him and found that the cause of the bleeding was the presence of internal hemorrhoids. Such hemorrhoids, as Dr. Becker stated, are very common. Mr. Vye also had "a very small polyp," which is a wart-like growth of the lining of the rectum—eight millimeters in circumference, of benign appearance, and which Dr. Becker linked with the rectal bleeding. The treatment for such bleeding is sitz baths, suppositories, and a local ointment, all designed to act against inflammation, and to avoid recurrences of bleeding, which Dr. Becker prescribed.

After this examination, Dr. Becker decided to listen to Mr. Vye's heart. He stated that he heard a diastolic murmur, with the heart examination otherwise being normal. A diastolic murmur is medically significant as showing a defect of the valves of the heart.

Further, in the printed form of the application for insurance it was set forth:

"If any part of any question is answered 'Yes,' give particulars. For medical histories, include: Nature of Ailment; Date; Duration, Attending physicians."

Referring to the questions to which he had answered "Yes," as 3A–4A and D. Mr. Vye answered:

"Had an executive type of exam. a short time ago by Dr. MacQueen. This included E.K.G., chest X-ray, Bl. Chemistry and Sigmoidoscopy. All reports normal. No treatment."

It is to be noted that in the above the insurance company wanted the medical

histories, nature of ailment, date, duration, and name of attending physician.

Mr. Vye's only ailment was hemorrhoids. As to the nature of ailments, Mr. Vye stated he could not recall any major ailment. The only treatment prescribed was a local ointment, sitz baths, and suppositories.

It is claimed by appellant insurance company that, in addition to a false representation that Mr. Vye had never had any known indication or been told that he had any disorder of the heart and blood vessels, Mr. Vye further was guilty of fraud in not disclosing to the insurance company that he had been examined and treated by Dr. Paul M. Becker for hemorrhoids, and that Dr. Becker had told him that he had a diastolic heart murmur, which is a matter of considerable medical significance. We disagree with this contention of appellant as to both of these claims of nondisclosure.

Mr. Vye called upon Dr. Becker on only one occasion, and that was for advice and treatment of rectal bleeding. Dr. Becker, as mentioned, prescribed a local ointment, sitz baths, and suppositories to alleviate the inflammation for this common inconvenience. There was no medical history, no duration of ailment, and no "attending physician" except that Dr. Becker examined the colon and prescribed the remedy during, perhaps, ten minutes of the appointment. Mr. Vye never asked for any general examination and received none.

The law is that it is not necessary to disclose trivial complaints. The hemorrhoids were trivial and they were cured by an ordinary common remedy. Lipsky v. Washington Nat. Ins. Co., 7 Mich. App. 632, 152 N.W.2d 702.

Dr. Becker testified that when Mr. Vye consulted him, it "was an ordinary office conversation. It was the first time I ever saw this gentleman. But I took a short history. * * * The history, now referring to my record:

"'In the past'—this refers to significant parts of the history, I don't write more down—'the past history of scarlet fever, with slow recovery. And questionable heart involvement.'"

"This is quoting the patient. And obviously considerable question, since I made three question marks behind my note.

Q. Would you explain to the jury perhaps what you mean by your three question marks that you refer to?

A. It would mean that the question quotes *apparently* some comment which he recalls this date back to his childhood about the degree of scarlet fever which was *apparently* slow recovery, prolonged, that *somebody* must have mentioned the heart was involved. The question marks *indicate that this was not established. This was not a firm diagnosis which the patient was aware of subsequently*.

In fact, as further conversations went with the patient, *he pointed out to me that he knew nothing* about any heart problem, because he had had subsequent examination. His company, in fact, I believe asked him to have subsequent —periodic heart examinations. *He mentioned that no heart disease was established at those examinations*. And the question marks simply indicate that it is not an established diagnosis, simply a comment referring back to childhood. * * * The further comment just illustrates that was, once more, periodic physicals. I have a note here, 'No significant abnormalities found.' * * * And the physicals entailed chest x-rays, he mentioned, *which were reported to him as being normal.* * * *

Q. What examination, if any, did you conduct at that time?

A. Examination was one of a short survey examination of the patient in general, including taking his

blood pressure, looking at his general apparent health, his skin, his head, his nose, throat, his neck, his chest, a heart examination we will come back to later, abdominal examination; and, now with reference to his complaint, the rectal examination, which included both a finger examination and examination by a sigmoidoscope. This is a term which we use when we use a tubular instrument which is inserted into the lower rectum for a certain length. It allows us to directly inspect the inside lining of the rectum, lower part of the colon, large bowel, and discloses to us any visible abnormality which, for instance, could have led to bleeding.

Q. What did that examination disclose? If anything.

A. The examination, to first do away with the patient's initial complaint, disclosed a definite presence of internal hemorrhoids. Hemorrhoids are dilated veins superficially close to the surface, located at the lower part of the rectum, very close to the exit point, and are very common.

The patient, in addition to the presence of hemorrhoids, had—quoting my notes—'a very small polyp'—which is a wart-like growth of the lining of the rectum, which was very small, two times three millimeters in circumference * * * which is an equivalent to maybe two and a half to three inches—up from the rectal opening; which, by appearance, looked entirely benign and, in my opinion, was ·not the source of his rectal bleeding, which I linked with the existing definitely present internal hemorrhoids, the most common cause for rectal bleeding." (Emphasis supplied.)

Dr. Becker prescribed sitz baths at home, suppositories, and a local ointment, all designed to act against inflammation, to avoid recurrences of bleeding.

All of the foregoing had to do with Mr. Vye's symptoms, his rectal bleeding and remedies therefor, and this was the only reason Mr. Vye called on Dr. Becker, who lived in the neighborhood, but was a total stranger to Mr. Vye. There is no dispute as to any of the foregoing.

However, Dr. Becker then suggested a heart examination with X-rays and an electrocardiogram, and Mr. Vye acquiesced.

Now we come to the main issue in the case.

Dr. Becker testified that during the heart examination he listened to the heart, and heard, "What we describe" as a diastolic murmur, with the heart examination otherwise being normal.

Dr. Becker further testified that

"the heart is an active pumping organ which goes basically through two phases of action, one is the active contraction of the heart muscle which results in a pumping out of a blood volume which has collected inside the heart chamber. This part of the active contraction we call 'systole.'

"Then, after the contraction, the heart muscle basically relaxes and is filled with a blood volume which it has to pump out again. This is called 'diastole.'

"We distinguish by listening to the heart when we are talking about heart murmurs, between the systolic murmurs and diastolic murmurs; which simply means the murmurs we hear during the active pumping part of the heart are the systolic ones, and murmurs we hear in the inactive phase are diastolic murmurs.

"There is one other way to distinguish, and this is referring now to heart sounds which also occur, there is this distinction from murmurs normally. The heart, when it beats—which you all may have heard on television or movies—makes a certain sound, anyone normal, something like 'lop dup.' 'Lop' would be the first

sound, call that 'S–1,' the first sound. And the 'dup' would be the second sound.

"These are sounds created by the valves in the heart as they are opened or closed.

"So, the heart action is 'lop dup, lop dup,' the first and second sound.

\* \* \* \* \* \*

"The diastole, as I explained already, the inactive part of the heart muscle, the heart muscle is filled passively, is filled after the second sound, which terminates the action, contraction part.

"Anything after the second sound occurring until the first sound comes in again would be diastole.

"Now, of course, if you refer to first and second sound, and say a systolic murmur occurs in this time span (indicating) between first and second sound, and the diastolic murmur occurs between or after the following the second sound, before the first sound, the next cycle comes in again. That is the distinction between systolic and diastolic murmurs. \* \* \* Now, then, as I indicated, I heard a diastolic murmur; which means I heard a heart murmur after the second sound of the heart. \* \* \*

"Since a diastolic murmur in the medical profession is almost immediately considered significant, that means a meaningful medical finding referring to some abnormality, the patient was advised by me that it would be smart—this has nothing to do with rectal bleeding, mind you—smart to have an electrocardiogram and have a chest x-ray taken to further elucidate the degree of meaningfulness this heart murmur documented.

"The patient agreed to this. He had an electrocardiogram taken in my office at that same conversation. *And the electrocardiogram was considered within normal limits by me.*

"Q. Did you make any diagnosis, at the time of your examination, of his condition?

A. On the basis of the presence of this diastolic murmur, I formed the opinion that the patient had an aortic valve defect, allowing the occurrence of the diastolic murmur. The shape of the murmur, the sound character of the murmur, was such to allow that diagnosis, a defect of the aortic valve in this patient's heart.

Q. Did you inform Mr. Vye of this diagnosis at that time?

A. I informed him of my opinion.

Q. What treatment, if any, did you prescribe at that time? This is your office.

A. *Now, we have to be careful.* The patient was not symptomatic. *That means he had no symptoms referrable to this particular finding. He, in other words, offered no symptoms to indicate that he had, in fact, heart disease.*

'The disclosure I made to him was simply that of *some* murmur existing carrying medical *significance.*

'*This didn't mean he had to be running around with shortwindedness or any other symptom referrable to the heart.*" (Emphasis supplied.)

Dr. Becker assumed that Mr. Vye had an aortic valvular defect, and he therefore gave Mr. Vye penicillin to avoid possible infection *"which could arise on this defective valve I assumed was present."* (Emphasis supplied.)

Mr. Vye also had an X-ray taken on Dr. Becker's suggestion.

Dr. Becker testified:

"Q. What, if anything, did you report to Mr. Vye concerning the results of this X-ray?

A. *I simply told him this is in accord with the short conversation we had about his heart in my office, that I still considered the finding significant enough to have somebody follow up in the*

*future on this particular finding; which means, for instance, no more than have it examined once a year to see whether this valvular defect I presumed was present gained significance in terms of producing symptoms* progressed to a point where it would need specific assistance to the heart to allow work under an extra load because of an existing defect. \* \* \*" (Emphasis supplied.)

The findings of the X-ray technician stated:

"The findings are *compatible* with aortic valvular disease. The study is otherwise negative."

It appears in further evidence that the X-ray findings were *compatible* with many other conditions of the heart, none of which carried any suggestion of disease or danger to Mr. Vye.

*The most important point in the diagnosis is that Mr. Vye, as was finally proved, and admitted by everyone, had no aortic valvular defect at any time; and the findings of the X-ray technician that they were compatible with aortic valvular disease are, therefore, completely without substance and worthless.*

This proof comes from the evidence at the autopsy examination of Mr. Vye. Dr. Becker, after the autopsy, admitted that the heart valves of Mr. Vye showed no disease or aortic defect whatever. His explanation of the mistake he had made in diagnosing Mr. Vye as having defective or diseased heart valves was that the heart murmur he had previously considered secondary to a defective aortic valve was not a defective valve at all; that Mr. Vye died of an aneurism, described by Dr. Becker as a cystic medial necrosis of the aortic wall, which weakens the aortic wall; that this can lead to progressive slow dilatation, or widening of the aortic wall, and that while the valves may be normal in structure, that the valves are pulled apart by such widening; that it gives the same sound phenomenon as a defective valve,

and that there is no way for a doctor to listen to a patient who is otherwise healthy, and has no heart symptoms, to know about this particular condition, except by a post-mortem examination which sheds light on the existing cause for an aortic valvular murmur. The autopsy, Dr. Becker went on, disclosed a very rare cause of aortic insufficiency.

"Q. And that is shown in the gross pathological discussion of the aorta or the microscopic?

A. The microscopic; 'Idiopathic cystic medial necrosis of the aorta,' number one diagnosis. \* \* \*

Q. It mentions in there some place something about the condition of the aorta that is being described as 'recognizable zone of acute inflammatory cell infiltration.' Does that mean, as you said before, something that occurred?

A. This was a description of the intima, of the internal lining.

Q. Now, what is there that says there is the period of time or any period of time as to the existence of the condition that you referred to of the medial?

A. 'Within the media there are irregular zones of acute hemorrhage with separation amongst the fibers and other zones of development of the irregular cystic space, a microscopic size amongst the medial fibers.'

\* \* \* \* \* \*

Q. Did you ever recommend to Mr. Vye that that he go to a cardiologist specifically?

A. I told him if he has any doubt in what I am telling him, he should have that rechecked by a cardiologist, any other internist, his company physician, a physician of his choice.

Q. Didn't you tell him to have it checked at the next physical examination? \* \* \* Did you tell Mr. Vye that when he came

to his next physical examination, he should call the attention of the company doctor to it?

A. By all means, yes.

\* \* \* \* \* \*

Q. I will quote your words \* \* \* 'I told Mr. Vye my opinion was he had very likely an aortic valvular disease, as indicated by the heart murmur, that I felt it was wise for him to have this mentioned to his company examiner to determine any confirmation of the finding, as well as possible future observation.' \* \* \*

A. I'm sure that I mentioned that to him.

\* \* \* \* \* \*

Q. You were asked whether you told Mr. Vye that his condition needed any medical attention. Would it be your recollection that you told him, 'to have this confirmed and followed up, kept under observation by either myself or by a competent physician of his choice, that immediate treatment was not necessary. The treatment consists of proper follow-up'?"

On cross examination, Dr. Becker was asked:

"Q. And you didn't tell him, then, anything about, 'Well, have this within a year or within six months or within two years'?

A. *If I told him all these details, it would have taken me two hours. I had a twenty-minute office call.*" (Emphasis supplied)

Dr. Becker did, however, tell Mr. Vye that the heart murmur was not causing him any trouble; that he had no symptoms of heart disease, and that the heart needed no specific treatment.

It is repeatedly claimed that Dr. Becker told Mr. Vye that he had a *diastolic* heart murmur. However, this is not borne out by Dr. Becker's testimony. He was asked:

"Q. And you did use the word 'diastolic' to him?

A. I am *quite* certain that I did."

Mr. Vye told Dr. Becker that no one had ever mentioned any heart involvement to him during his lifetime until he made a twenty-minute call on Dr. Becker for treatment of rectal bleeding on November 2, 1966. It appears that he had passed an examination for life insurance in 1946, twenty years before he saw Dr. Becker; and that the examining physician for appellant insurance company, Dr. Bell, after Dr. Becker's examination of Mr. Vye on November 20, 1967, found no diastolic murmur, and a physician, Dr. MacQueen, who was the partner of the insurance physician, had found no diastolic murmur after listening to his heart during a physical examination on November 8, 1967, *twelve* days before Dr. Bell's examination of Mr. Vye.

Dr. Bell found no abnormality in Mr. Vye's heart. Dr. MacQueen had found "a light systolic murmur at the apex which is of no significance." As Dr. Bell testified, a systolic murmur is a functional murmur, which is not organic and is of no significance. Dr. MacQueen testified he heard a systolic murmur, but no diastolic murmur. It is agreed that a systolic murmur is not organic, and comes and goes, and is of no significance.

Dr. Becker testified that systolic murmurs are easy to hear, but that diastolic murmurs are very difficult to hear. "It takes experience and it takes a certain tuning in, knowing from past experience what the murmurs are supposed to be like. They are easily overlooked, far easier than systolic murmurs."

Dr. MacQueen directly disputed the contention advanced by Dr. Becker that diastolic murmurs are more difficult to detect than systolic murmurs. He testified:

"Q. You mentioned that your findings of Mr. Vye were a systolic murmur, is that correct?

A. Yes.

Q. Did you find any evidence of a diastolic murmur?

A. I did not.

Q. Is that harder to detect?

A. No."

It is important in this case to know what kind of man Mr. Vye was. Mr. Vye was a stocky, well-developed man, fifty years old, five feet, eleven inches tall, weighing an estimated 205 pounds, with good musculature and development. He had never had any serious illness except scarlet fever when he was about ten years old, from which he had completely recovered. He never went to a hospital until the day of his death. He had had no illnesses of any consequence, and he did not even have a family doctor. He had been examined for life insurance by the "Mutual N.Y." and had secured a $5,000 policy which had been paid up. He also had been examined by the Northwestern Insurance Company and had secured a $45,000 policy in 1964.

Mr. Vye had been examined by the insurance doctors for the Massachusetts Mutual Life Insurance Company in this case, and the Woodall Company had secured a policy of $75,000 on his life, of which the company was the sole beneficiary. He had submitted to the examination, not in his own interest, but because the Woodall Company wished to check on the health of their employees, and take insurance out on them, in which Woodall would be the beneficiary, and, after a medical examination by the physician for the company, the policy was issued.

When Mr. Vye was in the Intensive Care Unit the first day, he was asked by Dr. Becker, who had not seen him for two years, "whether he had, in the interim *two* years, another examination, and what was disclosed to him during this examination, whether my personal finding was confirmed or not. And I recall that he told me it was not too long ago he had once more a company physical examination; that, at that examination, everything was found all right, and that the examining physician did not hear the murmur I described to him."

"Q. Now I understand, Dr. Becker, that following your second call to see Mr. Vye in 1968 (in the Intensive Care Unit) you did determine that he had actually done as you suggested, and called the condition to the attention of another doctor.

A. Yes.

Q. And you found that the other doctor had not confirmed to Mr. Vye, the findings that you had announced to him; did you not?

A. That is what he indicated to me.

Q. I see. And to the best of your knowledge, Mr. Vye had had no further difficulty with a heart condition, valvular condition, or any other condition since he [first] saw you, until November, 1968?"

The accompanying opinion sets forth that Mr. Vye, in the course of his physical examination by Dr. Becker, was told that he had a significant heart murmur considered secondary to a defective aortic valve. After the post-mortem examination, Dr. Becker admitted that he was mistaken with regard to his diagnosis in which he assumed that Mr. Vye had a significant heart murmur secondary to a defective aortic valve, since the heart valves were found to be healthy and not defective. Dr. Becker also told Mr. Vye he had no symptoms of any heart trouble but that, on his next physical examination, he should inform the physician making such examination of the condition that Dr. Becker diagnosed. Mr. Vye was further informed by Dr. Becker that X-rays should be taken and he acceded to this request. Thereafter, he was informed that the X-rays were compatible with Dr. Becker's diagnosis. The X-rays were also compatible with a healthy heart with no defects, such as an enlargement, which Dr. Becker acknowledged did not signify any heart trouble but might be due to hard, vigor-

ous work to which Mr. Vye was accustomed.

Nearly two years after Dr. Becker's examination, Mr. Vye signed an application for the insurance policy in suit. During the examination certain questions were asked Mr. Vye by Dr. J. Kenner Bell, who examined him for the appellant insurance company. During the trial Dr. Bell was asked by the insurance company whether he found any evidence of past or present disease of:

"B.  Heart, blood vessels, with any abnormality of size, position, rhythm, or sounds."

Dr. Bell answered "No."

Mr. Vye had been approved by the medical examiner of two insurance companies for life insurance. No one had ever told him that he had a heart involvement that would affect him. To have a doctor whom he consulted merely for hemorrhoids give out in such a way, seemingly, was enough to make him skeptical of such a diagnosis. And the fact that the diagnosis turned out to be false was an eventual justification of his skepticism. It is to be noted that when Dr. Becker realized Mr. Vye's disbelief in him, he made his diagnosis and recommendation so mild and phrased it in such language that a layman would consider there was really nothing to be disconcerted about and nothing of any serious nature in these recommendations.

These recommendations of Dr. Becker were:

"[T]he electrocardiogram was considered within normal limits by me * * *. The patient was not symptomatic. That means he had no symptoms referrable to this particular finding. He, in other words, offered no symptoms to indicate that he had, in fact, heart disease.

"The disclosure I made to him was simply that of some murmur existing carrying medical significance. * * *

"I simply told him this is in accord with the short conversation we had about his heart in my office, that I still considered the finding significant enough to have somebody follow up in the future on this particular finding; which means, for instance, no more than have it examined once a year to see whether this valvular defect I presumed was present gained significance in terms of producing symptoms, progressed to a point where it would need specific assistance to the heart to allow work under an extra load because of an existing defect.

        *    *    *    *    *    *

"Q.  Was there anything at all, Doctor, in this history that you took, that indicated Mr. Vye had suffered any symptoms or exhibited any symptoms of a heart disorder or disease?

"A.  No. * * * He was asymptomatic, he didn't have symptoms. * * * [I] told him that, in my opinion, he had a significant heart murmur which I considered secondary to a defective aortic valve and possibly related to the scarlet fever history he gave me, from childhood; *that the heart disease at the present time was not causing him any trouble; he was not symptomatic; that it needed no specific treatment*; that it needed, as many other things in a medical examination, follow-up examination, to keep this heart in surveillance to see whether this *presumed* aortic insufficiency got worse. If symptoms appeared at that time, he needed treatment. Certainly this is something which I think you should have checked again by me or anyone, just have it checked again." (Emphasis supplied.)

Dr. Becker later testified:

"Q.  And you didn't tell him, then, anything about, 'Well, have this within a year or within six months *or within two years*'?"

This was not denied by Dr. Becker. He answered:

"If I told him all these details, it would have taken me two hours. I had a twenty-minute office call."

Dr. Becker was asked:

"Q. I want you to know, Dr. Becker, what you did say to him, if you can tell us * * *

A. I don't recall my wording.

Q. Of course not."

A check-up within two years was actually carried out by Mr. Vye. He was examined by Dr. Becker on November 2, 1966; he was then examined by Dr. MacQueen on October 27, 1967, and by Dr. Ball, the Examiner for the insurance company, on November 20, 1967. The diagnosis of Dr. Becker was completely wrong. The diseased or defective valves upon which he based his diagnosis did not exist. On the autopsy they were found to be healthy and not diseased.

At the post-mortem examination, Dr. Becker admitted that the valves disclosed no diseased condition. What caused Mr. Vye's death was an aneurism. Dr. Becker quoted the pathologist, who described the aneurism, as stating in the autopsy report:

" 'The admitting history of chest pain referred to both the sternum and the interscapular areas'—which means to the back—'was indicative of the involvement of the aorta by a tearing process which gave rise to the clinical appearance of diaphoresis.' This means sweating. 'The underlying lesion'—do you want me to proceed?

Q. Yes.

A. 'The underlying lesion within the aorta has no recognizable etiological basis but in this instant was seen to be associated with foci of fibrinoid necrosis and acute inflammatory cell infiltration in the intima and around an intima blood vessel. The developing hemorrhage and dissection around the aorta eventually resulted in rupture through the wall and the development of the cardiac tamponade which was the proximal cause of death.'

* * * * * *

Q. Now, I would like to ask you a couple questions about this statement that there is, 'no recognizable etiological basis,' referring to the lesion within the aorta, I believe. What does that mean?

* * * * * *

A. 'Etiology' means a known cause for a given condition. 'Etiology' refers to a cause of an abnormality.

Q. Because of what?

A. Of any given abnormality or disease process. * * * The etiology of the changes described, which we already referred to yesterday of changes in the aortic wall, the cause for this is not known to the medical profession. It is open to speculation. We have our thoughts but we have no proof. This is why he says there is no etiologic basis known.

* * * * * *

Q. Let me read to you the very first sentence that you are talking about. 'The underlying lesion within the aorta has no recognizable etiological basis but in this instant was seen to be associated with foci or fibrinoid necrosis and acute inflammatory cell infiltration in the intima and around an intimal blood vessel.' Is that correct?

A. Yes. He is there referring to the inner coating of the aorta, which is called 'intima'.

Q. Yes. And when I ask you about that, Doctor, that is an area which is outside of the heart entirely, is it not?

A. Yes.

Q. So that, of course, is not a part of any heart valve or anything of that sort?

A. Not what he is talking about here.

Q. * * * And, then, you would gather from—or, to you, what is stated here, would mean that this aneurysm condition and rupture developed from the fact of the fibrinoid necrosis and acute inflammatory cell infiltration in the intima?

A. The underlying background for the dissection is related more to the changes in the media, that is the medial coat of the aorta. Medial necrosis, as the pathologist describes that in his diagnosis.

The intima, the changes in the intima which you now described as inflammatory, are not that important as the changes in the media.

Q. * * * It refers, in that sentence, to, 'an acute inflammatory cell infiltration.'

And what is the meaning of an acute one as opposed to, say, chronic?

A. Acute is something what takes place within hours, let's say, after some given injurious event. An acute response to some process going on means a response within hours or maybe days.

Chronic, in other words, on the other side, is a response which goes on over a long period of time."

After his call on Dr. Becker, Mr. Vye did not restrict his activities in any way, continuing to shovel snow and the like. During his entire life with Mrs. Vye, he was never confined to a hospital. Mr. Vye had worked up from small business positions in small towns in Ohio and Wisconsin, and finally became Executive Vice President of Woodall Industries, Inc., in Michigan. The sole beneficiary of the life insurance policy here in question, as heretofore said, was Woodall Industries, Inc.

With regard to his physical condition and physical work habits, Milton F. Mallender, of 6015 East Surrey Lane, Birmingham, Michigan, an attorney with offices in the Ford Building in Detroit, testified that Mr. Vye was his next-door neighbor for two years before his death. Mr. Vye had bought the house new, and it had been rough graded. Mr. Mallender told of Mr. Vye's work around the house in Birmingham, much of which is similar to that already recounted. During the first summer and fall, Mr. Vye spent his time preparing his yard for landscaping, which included wheeling dirt and cutting down trees, and digging holes for the planting of bushes and so forth. He would work every weekend at that particular work. Mr. Vye personally did the various tasks of cutting down trees and the like. One tree that was on the line between Mr. Mallender's property and that of Mr. Vye interfered with his access to his garage, and he asked Mr. Mallender if he had any objection if he took it down. Mr. Mallender had no objection and one Saturday, Mr. Vye and his son, who was in high school, removed the tree. Mr. Vye also trimmed his trees, borrowing Mr. Mallender's ladder to get up into the trees. Mr. Mallender also testified that Mr. Vye shoveled out his own driveway. Mr. Mallender had a man come with a tractor to take the snow off his driveway; but Mr. Vye shoveled his own. He had a power mower that he rode for mowing the lawn; but he would rake the leaves. He planted bushes that Mr. Mallender gave him, removing them from Mr. Mallender's lot, and took them over and planted the shrubbery in his lot. He later cut down another tree, sawed it up, and split the wood. He borrowed a sledge and a wedge from Mr. Mallender to split the wood. When Mr. Mallender returned from a trip east, he found that Mr. Vye had died that day.

What does the layman understand if he is told he has a systolic or diastolic murmur? The Chief Medical Director, Dr. C. Paul Nay, of appellant insurance company, sat attentively through the whole trial, and could not even remember whether Dr. Becker testified that

Mr. Vye had a systolic or diastolic murmur; (and Dr. Becker's testimony leaves it uncertain whether he ever told Mr. Vye that he had a diastolic murmur.) And Dr. Nay further gave as his view that it would be unusual for a layman to know the difference between a systolic and diastolic murmur. It is claimed that Mr. Vye's answers to the application for insurance (although hereafter proved truthful) were material misrepresentations and that a misrepresentation is material, when because of it a policy would not be issued. But it is not the absolute power of the insurer to decide whether it would accept the risk. The test of materiality is whether knowledge of the true facts would have influenced a *prudent* insurer in determining whether to accept the risk or in fixing the amount of premiums. And consequently the insured in this case is not bound by the statement that the insurer would have accepted the risk, and, if not, avoided or forfeited the policy. It is the truth that determines the right of the insurer so to act. (45 C.J.S. Insurance § 595, p. 406) Yet, in any event, under the facts in this case, no right of forfeiture could be sustained.

We have shown that Mr. Vye was not guilty of misrepresentation in stating that no one had told him he had disorder of the heart or blood vessels. But even if it be conceived that the word, "disorder," were ambiguous, it is elementary insurance law that ambiguous policy provisions must be construed against the insurance company and most favorably to the insured. Zurich Insurance Co. v. Rombough, 384 Mich. 228, 232, 180 N. W.2d 775.

Moreover, in Franklin Life Insurance Co. v. William J. Champion, 350 F.2d 115, 129 (C.A. 6), this Court said:

"The insured is not specially equipped to determine what facts are material to the acceptance of a risk. He may be expected to answer in good faith the questions that are put to him, but not to bring an understanding of medicine beyond that of the medical profession to the problem of materiality."

Among other things, Mr. Vye was told by Dr. Becker about the murmur:

"I simply told him this is in accord with the short conversation we had about his heart in my office, that I *still* considered the finding significant enough to have somebody follow up in the future on this particular finding; which means, for instance, no more than have it examined once a year to see whether this valvular defect *I presumed was present* gained significance in terms of producing symptoms, progressed to a point where it would need specific assistance to the heart to allow work under an extra load because of an existing defect. * * * Mr. Vye had no symptoms. * * * I told him that it was not causing any trouble, he needed no * * * treatment." (Emphasis supplied.)

After Dr. Becker took the X-ray of Mr. Vye in his office, he delivered the message over the phone to Mr. Vye, telling him that the X-ray "emphasized the need for follow-up examinations. That everything else was normal; that the fact that he had no symptoms indicated that he needed no other care, but to simply have the heart examined in the future, whether care would become necessary. He offered no symptoms that he had heart disease. The disclosure I made to him was simply that of some murmur existing carrying medical significance."

"Q. And the purpose of the future examination was to decide whether or not care was necessary in the future date, is that it?

A. Yes.

Q. And did you tell him there was no further or not treatment necessary at the time * * * ?

A. Yes. * * *

Q. And didn't you tell him, then, anything about, 'Well, have this within a year or six months *or within two years*'?

A. If I told him all those details, it would have taken me two hours. I had a twenty-minute office call."

The truth of Mr. Vye's answer to the question in the insurance application that at no time had he had any known indication of, or been told that he had, any disorder of the heart or blood vessels was, at most, for the jury to determine. No one testified that Mr. Vye ever had any "disorder" of the heart or of the blood vessels. What Dr. Becker told him was not that he had any such disorder of the heart; and whatever he said about the valves (which was unfounded) could be taken as speculation, or as some minor condition not worthy of mention, according to the statements made by Dr. Becker set forth in the prior paragraph.

As far as ailments went, Mr. Vye never knew he had an ailment.

No one ever told Mr. Vye that he had any *disorder* of the heart. No one ever told him he had any *disorder* of the blood vessels. The burden of proof was upon the plaintiff to prove the material misstatements alleged in the complaint.

It is the accepted law that the provisions of a life insurance policy will be construed strictly against the insurer and in favor of the insured and the provisions for a forfeiture will be strictly construed against an insurer and in favor of the insured.

Mr. Vye answered the question in the application that he had not been told he had any "disorder" of the heart or blood vessels. Applicant contends this answer was false. I disagree. Whether he truthfully responded to the questions in the application is determined by whether he truthfully responded to the questions as he understood them.

"Disorder" in a medical sense is defined in Webster's New International Dictionary as follows: "Disturbance in the functions of the animal economy, or of the soul. Synonyms—Irregularity, disarrangement, tumult, bustle, commotion, disturbance: disease, illness, indisposition, sickness, ailment, malady, dis-

temper." Admittedly, Mr. Vye was never told he had any of these "disorders," and, in answering "No," to the question, he truthfully responded to the questions as he understood them and even as the dictionary defines them; and, therefore, was guilty of no false representation.

It is to be remembered that Dr. Becker told him he had no symptoms indicating he had heart disease, and that the "disclosure I made to him was simply of *some* murmur existing carrying medical significance." Dr. Becker told him it was causing no trouble, and needed no specific treatment, but just to keep it checked within a year or two. Further, it is to be emphasized that his answer that he had no disorder of the heart or blood vessels was true, as a "disorder" means a malady, sickness or the like, according to common parlance and according also to Webster's New International Dictionary. This case does not depend upon *Franklin (supra)*. All answers of Mr. Vye were true. The burden of proof was upon the plaintiff to prove the material misstatements alleged in the complaint.

The truth of a representation refers to a truth synonymous with sincerity and lack of fraud, rather than to the literal meaning of truth, which is relating things exactly as they are. Franklin Life Insurance Company v. William J. Champion & Company, 350 F.2d 115 (C. A. 6).

With regard to the printed form of application in which it was set forth:

"If any part of any question is answered 'Yes,' give particulars. For medical histories, include: Nature of Ailment; Date; Duration, Attending physicians."

The above obviously called for information about any ailment suffered by Mr. Vye. Mr. Vye never suffered any ailment, except scarlet fever forty years previously. "He never suffered any ailment," even according to Dr. Becker.

In Mutual Benefit Life Ins. v. Abbott, 9 Mich.App. 547, 550, 556, 157 N.W.2d

806, 807, the applicant for insurance was asked in the printed application:

"Have you during the last five years received the services of a physician or an institution for electrocardiographic or x-ray studies, treatment, observation, diagnosis or a routine examination?"

His answer was "Yes." The printed application then went on:

"If the answer is 'yes' to any of the above questions, give reason, date, duration, and names of all hospitals and attending physicians."

The answer of the applicant was:

"April, 1957, Hemorrhoidectomy. Robert Kolesar, M.D. 10 days in hospital, Saginaw General."

The Insurance Company contended that the insured omitted to state "that he had sustained emotional problems, had frequent headaches and nausea and had received treatment from two doctors to relieve him of these difficulties." The Court said:

"The record does not show what kind of treatments were given, and it is possible that only some form of medicine was prescribed or psychiatric treatment given. It is also possible that the emotional condition was temporary and not serious in nature. There is no record of any hospitalization because of the complaints mentioned. As these questions and answers ought to be construed liberally in favor of the insured, we cannot say that defendant's omission to disclose the facts about his emotional problems and his headaches and nausea constitutes a material misstatement of fact in answer to the questions referred to. Certainly there is nothing in the record to indicate that Mr. Abbott believed that the conditions mentioned were symptoms of any serious ailments. That defendant attempted to answer the questions honestly and to the best of his ability is borne out by the fact that in answer to the specific question regarding treatments by a physician, he truthfully answered that

he had been hospitalized, named the doctor who treated him and gave the reason for his hospitalization."

Dr. Becker testified that "the autopsy, while showing normal aortic valves, showed a condition which we consider as one of the causes for an aortic murmur of the type I heard. * * * The cystic necrosis of the aortic wall is one process * * * which weakens the aortic wall. This can lead to progressive slow dilatation, widening of the aortic wall. While the valves are normal in structure, when the aortic widens, it pulls the valves apart. It gives one the same sound phenomenon as the defective valve, and there is no way for us by listening to a patient, who is otherwise healthy, has no symptoms, to know about this particular condition unless we come to the unfortunate postmortem examination which sheds considerable light on— and did for me—on the existing cause for an aortic valvular murmur."

What is inexplicable and unbelievable is Dr. Becker's diagnosis that Mr. Vye was, first, suffering from a diastolic murmur resulting from a diseased heart valve; and, when it was proved in the postmortem examination that Mr. Vye's heart valves were not diseased, but healthy, Dr. Becker attributed his first diagnosis to a very rare condition arising out of the involvement of the aorta by a tearing process or lesion *which causes the aortic wall to widen* and pulls the valves apart, and gives exactly the same sound phenomenon as a defective valve, although this results in an aneurism and is the result of an acute inflammatory cell infiltration—and such an infiltration takes place "within hours, or maybe days." And Dr. Becker examined him two years before his death during only a twenty-minute office call, primarily for a remedy for rectal bleeding, while Mr. Vye who, admittedly, never had any symptom of a heart disorder, had previously been examined by two examiners representing different insurance companies, who found his heart in perfect condition and passed him for life insurance; and subsequently his compa-

ny physician gave him an hour's examination and found no diastolic murmur— but in good health, as did also the medical examiner for appellant insurance company, who, likewise finding no diastolic murmur, passed him for the insurance which appellant insurance company issued to the company in which appellant was Executive Vice President.

Dr. Becker then, when confronted with the results of the postmortem examination of Mr. Vye, did admit that he had no valvular disease or defect of the heart valves. How, then, when Mr. Vye called upon him for a simple remedy for rectal bleeding, did he justify his diagnosis of a diastolic heart murmur resulting from a defective heart valve, medically significant, which should be reported to the company physician at his next examination, *for confirmation* of Dr. Becker's opinion.

Conceding that the postmortem examination showed the valves to be healthy, Dr. Becker explained his diagnosis of a diastolic murmur to be due, not to a defective heart valve, but to a very rare condition which produced a murmur similar to a diastolic murmur and which was indicative of the involvement of the aorta by a tearing process which gave rise to the clinical appearance of diaphoresis. Dr. Becker further explained that an underlying lesion of the aorta was associated with foci of fibrinoid necrosis and, as the postmortem examination showed, with *acute* inflammatory cell infiltration in the intima and around an intimal blood vessel; and that the aneurism of the heart, from which Mr. Vye died, was associated with the underlying lesion within the aorta; and that it was the developing hemorrhage and dissection around the aorta which eventually resulted in rupture through the wall, and the development of the cardiac tamponade (aneurism of the heart).

Now, the significant word in the foregoing is "acute." The postmortem examination with which Dr. Becker agreed, was that the underlying lesion of the heart was seen to be associated with foci of fibrinoid necrosis and "acute inflammatory cell infiltration in the intima and around an intimal blood vessel" which resulted in the developing hemorrhage and dissection around the aorta which resulted in the rupture and the *aneurism* causing death.

Dr. Becker was asked what was meant in the postmortem report by "an acute inflammatory cell infiltration," as opposed to a chronic infiltration, and, as mentioned hereinbefore, he replied:

"Acute is something that takes place within hours—let's say, after some injurious event. An acute response to some process going on means a response within hours, or maybe days.

"Chronic, in other words, on the other side, is a response which goes on over a long period of time."

Since Dr. Becker's explanation of hearing a diastolic murmur depends upon the rare condition which causes the aorta to widen and pull the valves apart, it is pertinent to note that although he had taken X-rays of the heart in 1966 and saw the X-rays taken in the hospital in 1968, they showed the heart relatively normal and compatible with a healthy heart. Dr. Becker, therefore, would have seen that the aorta had not widened. Without the widening of the aorta, the valves would not have been pulled apart, and no murmur simulating a diastolic murmur could have been heard. If the aorta had widened, Dr. Becker would have seen it in the X-ray film when he first claimed to have heard a diastolic murmur, caused by the valves pulling away. But in the X-ray film of a healthy heart, there would have been no widening of the aorta and no murmur caused by the valves pulling away from a widened aorta.

"Roentgenographic evidence of widening of the thoracic aorta is a common observation and is a helpful sign pointing to the diagnosis of dissecting an aneurism of the aorta."

Acquired Diseases of the Heart and Great Vessels (P. 1100) by Jesse E. Edwards, M.D., Consultant, Section of

Pathologic Anatomy, Mayo Clinic, and Professor of Pathology, Mayo Foundation, Graduate School, University of Minnesota, W. B. Saunders Company (1961).

Speaking of Diagnosis of Dissecting Hematoma, it is stated:

"Once considered, the diagnosis is often clear from the clinical picture alone. A widened or distorted aortic contour may be seen on a chest photograph." "The Heart," p. 1156, by J. Willis Hurst, Professor and Chairman, Department of Medicine, Emory University School of Medicine, and Chief of Medicine, Grady Memorial Hospital, Atlanta, Georgia, and R. Bruce Logue, Professor of Medicine (Cardiology), Emory University School of Medicine, and Chief of Medicine, Emory University Hospital, Atlanta, Georgia. McGraw Hill Book Company, 1970.

The conclusion is that Dr. Becker did not hear a diastolic murmur (when Mr. Vye called upon him for a hemorrhoid remedy) resulting from diseased valves, which were afterward found to be entirely healthy; and he did not hear a diastolic murmur as a result of a widening of the aortic wall, which pulled the valves apart—as there appeared no widening of the aorta at the time Dr. Becker took the first X-rays, or when the X-rays were taken at the hospital just before Mr. Vye's death.

Moreover, as heretofore emphasized, Mr. Vye's answer that he was never told he was suffering from a *disorder* of the heart or blood vessels was true, both in common parlance and according to the definition of "disorder" in all accepted dictionary definitions and meanings of the term.

In addition to the above, we have then, Mr. Vye, who, Dr. Becker admits, had no symptoms of heart trouble or heart disease. Dr. Becker also testified that: "The disclosure I made to him was simply of some murmur existing carrying medical significance;" that it was not causing him any trouble; that

he needed no specific treatment, and that the murmur should be checked by his company physician within six months or a year or two to see whether it "got worse." As to whether Dr. Becker told Mr. Vye he had a diastolic murmur, he was not sure. Dr. C. Paul Nay, the Chief Medical Director of the appellant insurance company, who, as mentioned, sat through the entire trial, could not remember Dr. Becker's mention of a "diastolic" murmur, and gave as his opinion that it would be unusual for a layman to know the difference between a systolic and a diastolic murmur. The X-rays taken by Dr. Becker were normal as was the electrocardiogram. Mr. Vye never had any symptoms of heart trouble until he was rushed to the Intensive Care Unit the day before he died. On cross-examination Dr. Becker was asked whether he had stated in a deposition that he had told Mr. Vye he had "very likely an aortic valvular disease." But, as Dr. Becker testified, he saw Mr. Vye only during a twenty-minute office call, and, when asked what he said to Mr. Vye, replied: "I don't recall my wording."

With regard to the one claim on which the appellant insurance company relies —that Mr. Vye falsely stated no one had ever told him he was suffering from a disorder of the heart or blood vessels, every dictionary meaning of "disorder" shows he was telling the truth. As to whether Mr. Vye was suffering from a "disorder" of the heart or blood vessels, there was no ambiguity according to every dictionary meaning of the term "disorder," as applied in medicine. But even if there were an ambiguity, it is the accepted law that all ambiguities in insurance policies must be resolved most strongly against the insurer. And it is equally the law that an appellate court will not search the record for grounds of reversal—and that, in construing the policy of insurance, every doubt is to be resolved against the insurer and in favor of the insured.

The policy holder, rather than the insured, is entitled to the benefit of infer-

ences and intendments which reasonably may be drawn from dubious and uncertain language of the insurance contract. It is the insurance company which uses uncertain terms at its peril. But here, the term, "disorder," in a medical sense is not uncertain.

It is the general rule that the appellate court, when considering whether the findings have evidentiary support, will consider only the evidence most favorable to the successful party, including all reasonable inferences which may be drawn therefrom which will be construed most strongly in favor of the judgment.

Here then, in conclusion, we have a man, Mr. Vye, at the age of 52, who, since childhood never had any illnesses except trivial and minor colds and the like; who had never been confined to a hospital; who did not even have a family physician; who, during his lifetime, in spite of the fulfillment of his important duties as Executive Vice President of an important corporation, engaged during the weekends in the most strenuous kind of activity—shoveling snow from the walks and driveway of his home while his neighbors employed men with tractors to do such work; cutting down, sawing, and splitting trees for firewood; removing dirt in wheelbarrows; digging holes for the planting of bushes, climbing ladders to get up into the trees to trim the branches, and many similar vigorous, physical tasks. During his entire lifetime he never had a pain in his chest, or symptoms of a heart condition. According to Dr. Becker, the neighborhood physician and the principal witness for the insurance company, who had examined him for a minor case of rectal bleeding from hemorrhoids, and afterward examined his heart, Mr. Vye had no symptoms of any heart disease; his electrocardiogram was within normal limits; and X-rays then taken of Mr. Vye showed that they were compatible with a healthy heart with no defects. It was not until a year and a half later, the day before his death, that he had chest pains and was taken to the Intensive Care Unit where, at first, he seemed to have recovered, but died the next day when he was removed from Intensive Care.

Mr. Vye is claimed by the insurance company to have been guilty of misrepresentation and fraud in the application for insurance, in which he had no interest whatever, direct or indirect, nor did any members of his family. To me, it is impossible to believe that a man like Mr. Vye, who held an important corporate office, and had always been an honest, upright man, would have deliberately defrauded an insurance company in the amount of $75,000, in a matter in which he would not profit and in which neither he nor his family had any interest. The claim that Mr. Vye was guilty of misrepresentation and fraud upon the insurance company is incredible.

The only interest that any party had in the insurance policy was that of the corporation in which Mr. Vye was associated as Executive Vice President. From what has heretofore been said, there is no proof that Mr. Vye was guilty of any misrepresentation and fraud, for the only claim of such fraud is that, in his application, he stated that no one had ever told him that he suffered from *disorders* of the heart or blood vessels. It is a fact that he had never suffered from such disorders, and no one had ever told him that he had such *disorders*.

It is, therefore, my view that any question raised by appellant insurance company was for the jury to determine, under the instructions as given by the trial court, and that the verdict in favor of appellee should be sustained.

We cannot hold from the evidence before us that Dr. Becker told Mr. Vye he had disorders of the heart or blood vessels, in view of the fact that he told him he had no symptoms of heart disease; that his heart needed no treatment; that it was causing him no trouble, but that because of a murmur, he should check up with a physician every year or every two years. Nothing in the above

constituted medical advice to Mr. Vye that he had disorders of the heart or blood vessels. A "disorder" of the heart is defined in Webster, as previously mentioned, in its physical sense, as a disease, illness, indisposition, sickness, ailment, malady or distemper. Under such a definition, and in common parlance, Mr. Vye had no disorders of the heart or blood vessels; and he had never been told that he had.

The District Court, in the motion for judgment notwithstanding verdict, said of Dr. Becker's examinations:

"[This] examination which consisted of various examinations, involving the rectum, an electrocardiogram, blood pressure, other aspects, and an attempt to convey to the applicant the seriousness of the heart murmur, took place within fifteen or twenty minutes. It seems to me that the jury could well infer, when they come to this question of weight, that there was no particular attempt on the part of the doctor to impress upon the applicant that he had a serious heart murmur and, on the contrary, other words seem to contradict it. Because the doctor also testified, 'I told him that he should perhaps have it confirmed if he wanted to go to another specialist for that purpose, but that it was something that should be watched. That if he had annual physicals at the company he works for, that would be sufficient.'

"I don't think that that falls, necessarily, into the category of whether he should or should not have believed that he had a heart murmur and therefore in response to the question, 'Have you been advised that you had a heart disorder?' that was an untruthful one. I think in view of the examination that he subsequently had with the company doctor, the company doctor said, 'You have a heart murmur

but it is insignificant.' Then, I think that he could well have truthfully and honestly and sincerely felt that this was an insignificant, minor type of thing that he was not required to report to the insurance company.

"I think that his subsequent conduct and the type of work that he did both physically and with regard to this business which we had testimony about, indicated that he considered it minor, and, therefore, the jury could find it unreportable or not necessary to be reported ailment."

To me, it seems erroneous that, on the evidence before it, this Court should hold, *as a matter of law*, that Mr. Vye was guilty of such a misrepresentation or swindle, and that, on these grounds, the judgment should be reversed. There is a presumption that a man does not make a fraudulent misstatement. Penn Mut. Life Ins. Co. v. Mechanics' Savings Bank and Trust Co., 72 F. 413, 442 (CCA 6), and this rule applies with special force to Mr. Vye, in the circumstances of this case. I am of the view that the verdict in favor of the appellee and the judgment entered thereon should be affirmed.

### ORDER DENYING PETITION FOR REHEARING

Before PHILLIPS, Chief Judge,* and McALLISTER and O'SULLIVAN, Senior Circuit Judges.

Upon consideration, it is ordered that the petition for rehearing be and hereby is denied.

Senior Circuit Judge McALLISTER dissents, for the reasons stated in his dissenting opinion filed April 6, 1973, and the dissenting opinion filed herewith. He remains of the view that the judgment of the District Court should be affirmed.

Entered by order of the court.

* The majority opinion in this case was written by Circuit Judge W. Wallace Kent, who died May 28, 1973. Judge

Phillips was substituted for Judge Kent on the panel for disposition of the petition for rehearing.

**1008**

McALLISTER, Senior Circuit Judge (dissenting to order denying rehearing).

This whole case depends upon one simple issue.

When appellee's decedent, John H. Vye, in his application for life insurance on November 20, 1967, was asked whether he had ever been told that he had a disorder of the heart or blood vessels, he answered "No." Appellee contends that this was an honest answer.

Appellant contends it was a false answer. If Mr. Vye's answer was an honest one, the judgment of the District Court must be affirmed.

Mr. Vye, at the time of his death in 1968, had never been ill for a day, except for a case of scarlet fever when he was 12 years old. He had never been confined to a hospital and, at no time, did he ever have a family doctor.

Although Mr. Vye had, through the years, become Executive Vice President of a corporation, he was a most vigorous man, using all his spare time engaging in physical work around his home, such as cutting trees, planting bushes, splitting logs, mowing the lawn, removing leaves from the roof and gutters, as well as removing snow from the roof of his home, shoveling snow from the walks and driveways, while his neighbors hired men with tractors to do this particular work; trimming trees by getting up into them by ladders, as well as removing screens and storm-windows each season—all of which requires unusual physical effort, such that in our day most men of his age, in similar employment, hire others to do.

Mr. Vye had been insured in 1946 for $5,000; and, in 1964, for an additional $45,000. In November 1967, he was insured for an additional $75,000. All of these policies were payable to his employer. Neither Mr. Vye nor any member of his family had any interest, direct or indirect, in them. In no case had any examining insurance physician raised any question about his health.

In the last insurance policy of $75,000 on the life of Mr. Vye, payable to his employer, Woodall Industries, and issued by appellant, Massachusetts Mutual Life Insurance Company, Mr. Vye, on November 8, 1967, first consulted a reputable physician, Dr. M. D. MacQueen, for a physical examination lasting from one hour to an hour and a half. Prior to such examination, Mr. Vye signed a form, addressed to Dr. MacQueen, stating that he relied upon the record of the physical examination by Dr. MacQueen "as the most dependable source of detailed information I can supply (to Massachusetts Mutual Life Insurance Company) in an effort to establish my insurability."

Dr. MacQueen was a physician of 49 years' experience. He had never known or met Mr. Vye before. His examination of Mr. Vye included, among other matters, Mr. Vye's blood pressure, pulse, general physical condition, chest X-ray, cholesteric test, blood count, electrocardiogram and stethoscopic examination. His findings were normal for a man of Mr. Vye's age. He also noted that Mr. Vye had a slight systolic murmur at the apex of the heart, which Dr. MacQueen reported was "of no significance." Dr. MacQueen also reported that there was nothing about the condition of Mr. Vye's heart which indicated that there had been any prior heart difficulty or abnormality. After filing the report, Dr. MacQueen testified that he had never done any further professional work for Mr. Vye, or had any personal contact with him.

The physical examination of Mr. Vye by Dr. MacQueen had been arranged by Woodall Industries. Dr. MacQueen described the examination as fairly extensive and reported that while he had detected a systolic murmur of the heart, there was no evidence of a diastolic murmur. A diastolic murmur, the doctor said, was considered more serious, as it puts more work on the heart and the stricture of the heart becomes more severe. A diastolic murmur, Dr. MacQueen testified, is no harder to detect than a systolic murmur, which is of no importance. The report of Dr. MacQueen was sent to appellant, Massa-

chusetts Mutual Life Insurance Company, as requested by Mr. Vye and by the appellant insurance company. Dr. MacQueen was not the examining physician of appellant insurance company. Dr. John Kenner Bell was the examining physician for the insurance company. However, Dr. MacQueen and Dr. Bell had been partners for 42 years. Nevertheless, the records of Dr. MacQueen are not seen by Dr. Bell, and would not be seen by Dr. Bell without Mr. Vye's written authorization.

Dr. Bell examined Mr. Vye on November 20, 1967, for the life insurance policy of $75,000 requested by Woodall Industries. In this case we are concerned with the examination by Dr. Bell of Mr. Vye's heart. He found no abnormalities whatever on his examination of Mr. Vye's heart. Although Dr. MacQueen had detected a systolic murmur—this is the kind of murmur that comes and disappears from time to time—and is of no importance, Dr. Bell found no murmur of any kind in Mr. Vye's heart; and it was on Dr. Bell's report that the insurance policy was issued.

### Contention of Insurance Company

The entire claim of the insurance company rests on statements made by Dr. Paul M. Becker. He was a doctor in the neighborhood; and Mr. Vye, who had never seen him before, called on him for advice and treatment of rectal bleeding. It was a routine call. Dr. Becker testified it was "an ordinary office conversation. It was the first time I ever saw this gentleman." Dr. Becker prescribed sitz baths at home, suppositories, and a local ointment, all designed to act against inflammation and avoid recurrence of bleeding. This treatment was successful as Mr. Vye never returned for further treatment.

However, Dr. Becker listened to Mr. Vye's heart. He stated that he heard a diastolic murmur and advised him to watch it in the future. The heart was otherwise normal. However, Mr. Vye immediately pointed out to him that he knew nothing about any heart problem; and had never been told to watch his heart in the future. He stated that he had insurance-company physical examinations before, and "no heart disease was established at those examinations." Dr. Becker, however, told Mr. Vye "that it would be smart" to have an electrocardiogram and a chest X-ray. Mr. Vye consented; and the electrocardiogram and X-ray were within normal limits. However, Dr. Becker stated that he formed the opinion that Mr. Vye had an aortic *valve* defect, because of the murmur—"a defect of the aortic *valve* in this patient's heart."

Dr. Becker was then asked what treatment he prescribed. He answered: "He offered no symptoms to indicate that he had, in fact, heart disease. The disclosure I made to him was simply that of some murmur existing, carrying medical significance." Dr. Becker told Mr. Vye that the fact that he had no symptoms indicated that he needed no other care, but to simply have the heart examined in the future, "whether care would be necessary." Dr. Becker further told him that there was "no further treatment necessary at the time." Dr. Becker further told Mr. Vye that "it was not causing any trouble, he needed no * * * treatment."

Dr. Becker prescribed no medicine or treatment for Mr. Vye. His only medical advice was that he considered the finding of an aortic valve defect significant enough "to have somebody follow up in the future on this particular finding; which means no more than to have it examined once a year to see whether this valvular defect I *presumed was present gained significance in terms of producing symptoms, progressed to a point where it would need specific assistance to the heart to allow work under an extra load because of an existing defect.*" (Emphasis supplied.) Nothing was said about what specific assistance the heart would need, or whether Mr. Vye was going to carry "an extra load."

With regard to the examinations that Dr. Becker suggested Mr. Vye have made in the future, Dr. Becker was asked:

"Q. And you didn't tell him, then, anything about, well, have this within a year, or within six months, or within two years?

A. *If I had told him all those details, it would have taken me two hours. I had a twenty-minute office call.*" (Emphasis supplied.)

The medical examination Mr. Vye afterward had on his insurance application lasted one and a half hours, and showed him to be in perfect condition and completely acceptable as an insurance risk. Dr. Becker had suggested such an examination once a year and, again, to have his heart checked whenever he had his examinations by the company physician. Dr. Becker testified that the purpose of a future examination was to decide whether or not care was necessary at a future date. Such a date might be 25 years in the future.

Summing up, then, after Dr. Becker had finished his examination of the rectal bleeding, he listened to Mr. Vye's heart. He went on to reassure Mr. Vye that:

1. He had no symptoms of heart disease.

2. His heart was causing him no trouble.

3. He needed no treatment.

4. The chest X-ray was satisfactory.

5. The electrocardiogram was satisfactory.

6. He had some murmur existing carrying medical significance.

His only advice was to have the heart checked by some physician every year or two to see if it needed specific assistance to carry an "extra load,"—no extra load being contemplated. There was at no time any evidence that Dr. Becker told Mr. Vye that he had a serious or dangerous condition.

After the physical examination by Dr. Becker, it is of interest to note that Milton F. Mallender, of 6015 West Surrey Lane, Birmingham, Michigan, an attorney with offices in the Ford Building in Detroit, testified that Mr. Vye was his next-door neighbor for two years before his death. Mr. Vye had bought the house new, and it had been rough graded. Mr. Mallender told of Mr. Vye's work around the house in Birmingham, much of which is similar to that already recounted. During the first summer and fall, Mr. Vye spent his time preparing his yard for landscaping, which included wheeling dirt and cutting down trees, and digging holes for the planting of bushes and so forth. He would work every weekend at that particular work. Mr. Vye personally did the various tasks of cutting down trees and the like. One tree that was on the line between Mr. Mallender's property and that of Mr. Vye interfered with his access to his garage, and he asked Mr. Mallender if he had any objection if he took it down. Mr. Mallender had no objection, and one Saturday, Mr. Vye and his son, who was in high school, removed the tree. Mr. Vye also trimmed his trees, borrowing Mr. Mallender's ladder to get up into the trees. Mr. Mallender also testified that Mr. Vye shoveled out his own driveway. Mr. Mallender had a man come with a tractor to take the snow off his driveway; but Mr. Vye shoveled his own. He had a power mower that he rode for mowing the lawn; but he would rake the leaves. He planted bushes that Mr. Mallender gave him, removing them from Mr. Mallender's lot, and took them over and planted the shrubbery in his lot. He later cut down another tree, sawed it up and, with a sledge and wedge borrowed from Mr. Mallender, split the wood. When Mr. Mallender returned from a trip east, he was informed of Mr. Vye's death.

The above is recited only to show Mr. Vye's abounding health and the admitted absence of any heart disease or illness up to the day of his death.

It should be noted that the insurance company asked numerous direct ques-

tions of Mr. Vye, which bore on the heart. The company asked:

"4. During the last ten years have you had

A. Advice from or attendance or treatment by physicians, other practitioners or psychologists?
Answer: Yes

B. Treatment or observation in a clinic, hospital or sanitorium?
Answer: Yes

During the past ten years have you had any known indication of:

A. Pain, pressure, or discomfort in the chest?    Answer: No

B. Shortness of breath, palpitation or irregular heart action?
Answer: No

Cause of death of Father?
Answer: Heart."

All of these answers were admittedly true.

The claim of the insurance company is that Mr. Vye lied in his written application for insurance in stating, in answer to a question:

"Q. At any time have you had any known indication of or have you been told that you had

(a) Any disorder of the heart or blood vessels?"

The company claims Mr. Vye's answer, "No," was a lie and a fraud committed on the insurance company to secure the policy.

So the issue boils down to the question of whether Dr. Becker told Mr. Vye he had a disorder of the heart or blood vessels.

The other questions asked by the insurance company covered every kind of heart disease. It is conceded all were answered truthfully by Mr. Vye. The only claimed lie is that Mr. Vye had not been told by anyone that he had a *disorder* of the heart or blood vessels.

Dr. Becker was the only one of five physicians who examined Mr. Vye and detected what he said he "assumed" was *valvular disease,* causing the murmur which he and no one else heard or detected.

Valvular disease causes diastolic murmurs in the heart and it was this assumed valvular disease that Dr. Becker relied upon in his diagnosis of diastolic murmur. But a postmortem examination showed that Mr. Vye's heart valves were healthy and without any defect.

When Dr. Becker was challenged on this during cross-examination, he admitted he was wrong in his diagnosis of valvular disease, and was wrong in diagnosing a diastolic murmur as a result of the *assumed* valvular disease. It is to be noted that Dr. Becker never claimed that Mr. Vye had heart disease. When cross-examined with regard to whether he used the word "diastolic" to Mr. Vye, Dr. Becker's answer was that "I am *quite* certain that I did."   .

When Dr. Becker was asked what he actually told Mr. Vye about having future examinations from time to time, his answer was: "I don't recall my wording."

Dr. Nay, the Chief Medical Director of appellant insurance company, who sat through the entire trial, stated that he could not remember that Dr. Becker had mentioned "diastolic murmur" in his testimony. But this is, in any event, unimportant, because Dr. Nay, from his experience, stated it would be unusual for a layman to know the difference between a "systolic" murmur and a "diastolic" murmur.

To get down to the basic question, Mr. Vye is charged with lying and fraud in representing to the insurance company that no one ever told him that he had any *disorder* of the heart or blood vessels.

What is a disorder of the heart? What are diseases of the heart, or ailments of the heart, or heart attacks, or serious conditions of the heart, or indispositions of the heart? Strangely enough, "disorder" is a word of rare use. Dictionary meanings are not controlling as to the use of words. Yet, one of the few definitions of "disorder" is found and defined

in Webster's New International Dictionary as "a disease, illness, indisposition, sickness, ailment, malady or distemper." No one contends that Mr. Vye was suffering from a disease, illness, or distemper. Dr. Becker emphasized he had no disease and needed no medical assistance. In Black's Law Dictionary, Revised 4th Edition, the only definition of "Disorder" is given in a quotation: "Usually a slight, partial, and temporary physical ailment. Pacific Mutual Life Insurance Co. v. McCombs, 188 Ark. 52, 64 S.W.2d 333."

What was Mr. Vye to understand from the question whether he ever had a disorder of the heart? "Whether insured truthfully answered questions in the application is determined by whether he truthfully responded to the questions as he understood them." 45 C.J.S. Insurance § 595, p. 395. Service Life Ins. Co. of Omaha, Neb. v. McCullough, 234 Iowa 817, 13 N.W.2d 440. "The law is that it is not necessary to disclose trivial complaints in his application for insurance. The hemorrhoids were trivial, and cured by an ordinary remedy." Lipsky v. Washington National Insurance Co., 7 Mich.App. 632, 152 N.W.2d 702.

"The law is settled that in a representation, contained in an application for insurance, that the insured is in good health, or that he has not been subject to illness, or that he has not been attended by a physician or consulted one professionally, the answer is to be construed as meaning, in the one case, that he has not suffered an illness of a serious nature, tending to undermine the constitution, and that a state of health is freedom from disease or ailment that affects the general soundness or healthiness of the system seriously. And as to representations as to treatment by physicians, the omission to state a treatment by a physician for some temporary indisposition does not avoid the policy." Blumenthal v. Berkshire Life-Ins. Co., 134 Mich. 216, 96 N.W. 17.

"Insured, in applying for life policy, was not obliged under Michigan law to disclose any ailments or medical treatments which involved only slight or temporary indispositions or routine check-ups." Miller v. Pacific Mutl. Life Ins. Co., 17 F.R.D. 121, affirmed 228 F.2d 889.

"An anaemic murmur, indicating no structural defect of the heart, but arising simply from a temporary debility or weakened condition of the body, is not within the meaning of the term 'bodily or mental infirmity,' in an application for accident insurance, in which the applicant states his freedom from such infirmities." Manufacturers' Accident Indemnity Co. v. Dorgan, 58 F. 945, 6 C.C.A. 581, 22 L. R.A. 620.

"If the insured in good faith answers questions which are ambiguous, doubtful, or obscure, the representations will be construed in his favor, and against the insurer. Likewise, if the inquiry is so framed that it does not clearly inform the insured of its meaning, and he may have been honestly mistaken as to what was intended, and his answer, by fair and reasonable construction, may be considered a true one in response to the question as he understood it, such interpretation will be given, and a forfeiture precluded. 7 Couch, Insurance 2d Ed. § 35: 145 at 164." MFA Mutual Insurance Company v. Lusby, 295 F.Supp. 660 (1969).

We are impressed with the statement of the District Court in the motion for judgment notwithstanding verdict, in which he said of Dr. Becker's examination:

"[This] examination which consisted of various examinations, involving the rectum, an electrocardiogram, blood pressure, other aspects, and an attempt to convey to the applicant the seriousness of the heart murmur, took place within 15 or 20 minutes. *It seems to me that the jury could well infer, when they come to this question of weight, that there was no particular attempt on the part of the doctor to impress upon the applicant that he had a serious heart murmur and,*

*on the contrary, other words seem to contradict it.* Because the doctor also testified, 'I told him that he should perhaps have it confirmed if he wanted to go to another specialist for that purpose, but that it was something that should be watched. *That if he has annual physicals at the company, that would be sufficient.*'

\*     \*     \*     \*     \*     \*

"I think in view of the examination that he subsequently had with the company doctor, the company doctor said, 'You have a heart murmur but it is insignificant.' Then, I think he could well have truthfully and honestly and sincerely felt that this was an insignificant, minor type of thing that he was not required to report to .the insurance company." (Emphasis supplied.)

"Most trials are a battle of probabilities," a great lawyer once declared. In this case, the probabilities seem unquestionable that Mr. Vye believed that this was a minor kind of thing, a slight or temporary situation, and the law does not require the applicant to disclose trivial minor complaints.

Mr. Vye had no interest whatever in the insurance policy, nor did any of his family.

Since childhood, Mr. Vye had never been ill until the day of his death. He had never suffered any pain, pressure or discomfort in the chest. He never had suffered from shortness of breath, palpitation or irregular heart action. His life, up to the time of his death, had been one of vigorous *physical* work, at all times when he was not officially acting for his corporation. Would any reasonable man with a dangerous heart disease have engaged in such arduous physical labor? All the probabilities in this case demonstrate that he was convinced he was not subject to heart disease; that he had no interest in lying to secure life insurance for his company after his death; that he had no reason to believe he had anything but a trivial minor complaint; no one had ever told him that he had any disorder of the heart or blood vessels and, since it is not necessary to disclose minor or trivial complaints in an application for life insurance, the policy is in full force and effect.

When Dr. Becker testified that he "read the x-ray, radiologist's opinion of mild cardiomegaly consistent with aortic valvular disease—consistent, in other words, with my opinion"—the case, as diagnosed by him and the radiologist, fell apart for this reason: The postmortem examination disclosed there was no aortic valvular disease, and that the heart valves were perfectly healthy—and this was admitted by Dr. Becker after the postmortem. Moreover, the mild cardiomegaly, or slight enlargement of the heart, had no bearing on the case since, after the postmortem, it could not have had any relationship with the valvular disease—the diagnosis which Dr. Becker clung to until the portmortem showed the valves to be healthy.

Dr. Becker never mentioned a "disorder of the heart or blood vessels" to Mr. Vye. When Dr. Becker assured Mr. Vye that he had no heart disease; that he had no symptoms of heart disease; that he .needed no care; that no treatment was necessary, and that it was not causing him any trouble; that every few years he should check with the company medical examiner and that would be sufficient as far as care went—what was Mr. Vye to understand as to whether he had a disorder of the heart or blood vessels, which had never been mentioned to him? He answered "No" to such question on the application for insurance. Whether he truthfully answered the question in the application is to be determined by whether he truthfully responded to the question as he understood it.

The policy-holder rather than the insured is entitled to the benefit of inferences and intendments which may reasonably be drawn from dubious and uncertain language; and, in construing a policy of insurance, every doubt is to be resolved against the insurer and in favor of the insured.

In my opinion, the evidence discloses that Mr. Vye truthfully answered the question in the insurance application that he had never been told he had a disorder of the heart or of the blood vessels.

In the transcript of testimony, hundreds of questions about the heart were asked in ordinary and technical language by many witnesses, but one looks in vain for any question as to whether Mr. Vye had ever been told that he had a disorder of the heart or of the blood vessels.

All of the foregoing questions were, in my view, jury questions, and were submitted to the jury under proper instructions.

On the petition for rehearing, the judgment heretofore entered should be set aside, and a judgment entered in favor of appellee.